**RECEIVED**

JUL **3 0** 2015

**CLERK OF DISTRICT COURT**
**SOUTHERN DISTRICT OF IOWA**

IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF IOWA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | CRIMINAL NO. 4:15-CR-103 |
| ) | |
| v. ) | Count 1: 18 U.S.C. § 371 (Conspiracy) |
| ) | |
| JESSE R. BENTON, ) | Count 2: 18 U.S.C. §§ 2 & 1519 |
| (Counts 1, 2, 3, 4, & 5), ) | (Causing False Records) |
| FREDERICK ) | |
| JOHN Ӎ. TATE, ) | Count 3: 52 U.S.C. §§ 30104(a)(1), |
| (Counts 1, 2, 3, & 4), ) | 30104(b)(5)(A), & 30109(d)(1)(A)(i), |
| ) | and 18 U.S.C. § 2 (Causing False |
| and ) | Campaign Expenditure Reports) |
| ) | |
| DIMITRIOS N. KESARI, ) | Count 4: 18 U.S.C. §§ 2 & 1001(a)(1) |
| (a/k/a Dimitri Kesari) ) | (False Statements Scheme) |
| (Counts 1, 2, 3, 4, & 6), ) | |
| ) | Count 5: 18 U.S.C. §§ 2 & 1001(a)(2) |
| Defendants. ) | (False Statements) |
| ) | |
| ) | Count 6: 18 U.S.C. § 1512(b)(3) |
| ) | (Obstruction of Justice – Witness) |

**INDICTMENT**

8/20/15 Ordered by Judge Bremer at time of arraignment to ammend
the indictment to correct defendant Tate's middle name to
FREDERICK.

THE GRAND JURY CHARGES THAT:

**GENERAL ALLEGATIONS**

At times relevant to this Indictment:

1.      Candidate A was a candidate for her political party's nomination to the Office of

President of the United States in the 2012 election cycle, including the Iowa Straw Poll and the

Iowa Caucuses.

2.      Political Committee 1 was Candidate A's authorized campaign committee for the

Office of President of the United States.

1

3.     Candidate B was a candidate for nomination of the same political party as Candidate A to the Office of President of the United States in the 2012 election cycle, including the Iowa Straw Poll and the Iowa Caucuses.

4.     Political Committee 2 was Candidate B's authorized campaign committee for the Office of President of the United States.

5.     Defendant JESSE R. BENTON was a senior official of Political Committee 2.

6.     Defendant JOHN FREDERICK TATE was a senior official of Political Committee 2.

7.     Defendant DIMITRIOS N. KESARI (a/k/a Dimitri Kesari) was a political operative of Political Committee 2.

8.     Throughout the existence of Political Committee 2, from in or about May 2011 to in or about August 2012, defendant KESARI reported to defendants BENTON and TATE, while defendants BENTON and TATE ran the campaign operations of Candidate B.

9.     Kent Leroy Sorenson was an elected Iowa State Senator in the same political party as Candidate A and Candidate B.

10.     The Federal Election Campaign Act of 1971, as amended, Title 52, United States Code, Sections 30101, et seq., ("Election Act") (formerly Title 2, United States Code, Sections 431, et seq.), applied to the election of candidates for federal office, including the Office of President of the United States, as follows:

      a.     The Election Act required the authorized campaign committee of a candidate for federal office to accurately report certain expenditures by that committee to the Federal Election Commission (FEC), the agency and department of the United States with jurisdiction to enforce the Election Act.

2

      b.  The Election Act required the FEC to publicly report accurate information provided by campaign committees.

11.    The Federal Bureau of Investigation (FBI) was an agency and department of the United States with jurisdiction to investigate criminal violations of the Election Act.

3

## COUNT ONE
(Conspiracy)

12.    Paragraphs 1 through 11 of this Indictment are re-alleged as if fully set forth

herein.

13.    From in or about October 2011 to in or about August 2014, in the Southern

District of Iowa and elsewhere, the defendants,

JESSE R. BENTON,
JOHN M. TATE, and
DIMITRIOS N. KESARI,

conspired and agreed with each other, with Iowa State Senator Kent Leroy Sorenson, and with

others known and unknown to the Grand Jury, to:

a.   Knowingly defraud the United States;

b.   Knowingly cause the concealing, covering up, falsification, and making of false
     entries in records, documents, and tangible objects, with the intent to impede obstruct,
     and influence the investigation and proper administration of a matter within the
     jurisdiction of a department and agency of the United States, and in relation to and
     contemplation of such matter and case (in violation of 18 U.S.C. §§ 2 & 1519);

c.   Willfully cause the submission of false expenditure reports of an authorized campaign
     committee to the FEC, which concerned no less than $25,000 in a calendar year (in
     violation of 52 U.S.C. §§ 30104(a)(1), 30104(b)(5)(A), & 30109(d)(1)(A)(i) and 18
     U.S.C. § 2); and

d.   Knowingly and willfully falsify, conceal, and cover up by a trick, scheme, and device
     a material fact in a matter within the jurisdiction of the executive branch of the
     government of the United States (in violation of 18 U.S.C. §§ 2 and 1001(a)(1)).

### PURPOSE OF THE CONSPIRACY

14.    The purpose of the conspiracy was to defeat the lawful function of the FEC by concealing

and falsifying the records and reports of expenditures of Political Committee 2 so that the FEC

could not reveal to the public that Political Committee 2 paid Senator Sorenson after Senator

4

Sorenson switched his political support from Candidate A to Candidate B, and the purpose was further to conceal the existence, purpose, and acts of the conspiracy.

## MANNER AND MEANS

15.   The manner and means of the conspiracy included the following:

    a.  The conspirators would and did negotiate with Senator Sorenson and provide him with a thing of value and the promise of further payments to secure his defection from Candidate A to Candidate B.

    b.  The conspirators would and did cause payments to Senator Sorenson by Political Committee 2 totaling $73,000 for Senator Sorenson's political support of Candidate B, and concealed those payments from Candidate B, the FEC, the FBI, and the public.

    c.  The conspirators would and did use two intermediary companies—Film Production Company W and Senator Sorenson's company, Grassroots Strategy, Inc. (hereafter "Grassroots Strategy")—to conceal the payments to Senator Sorenson by Political Committee 2.

    d.  The conspirators would and did conceal the payments to Senator Sorenson by Political Committee 2 by using false invoices from Grassroots Strategy to Film Production Company W, and from Film Production Company W to Political Committee 2.

    e.  The conspirators would and did cause Political Committee 2 to keep false records and submit false reports to the FEC.

    f.  The conspirators would and did cause, make, and attempt to transmit false statements to the public and to the FBI to conceal the conspiracy.

## OVERT ACTS

16.    In furtherance of the conspiracy, and to accomplish its purpose, the defendants,

JESSE R. BENTON,
JOHN M. TATE, and
DIMITRIOS N. KESARI,

and Iowa State Senator Kent Leroy Sorenson, and others known and unknown to the Grand Jury,

committed the following overt acts, among others, in the Southern District of Iowa and

elsewhere.

a.    On or about October 31, 2011, BENTON emailed Senator Sorenson and a

representative of Senator Sorenson offering to continue to pay Senator Sorenson

the salary he had been receiving from Political Committee 1 if Senator Sorenson

would defect from Political Committee 1 to Political Committee 2 by

withdrawing his endorsement of Candidate A for the Office of President of the

United States and endorsing Candidate B instead;

b.    Between on or about November 15, 2011 and on or about December 28, 2011,

KESARI spoke several times with Senator Sorenson in an effort to persuade

Senator Sorenson to withdraw his endorsement of Candidate A and to endorse

Candidate B;

c.    On or about December 23, 2011, KESARI emailed Senator Sorenson asking

Senator Sorenson to send KESARI a draft press release announcing Senator

Sorenson's decision to endorse Candidate B;

6

d.    On or about December 24, 2011, KESARI emailed Senator Sorenson reminding him to send the draft press release;

e.    On or about December 25, 2011, BENTON, TATE, KESARI, and others edited a press release written by Senator Sorenson announcing his decision to endorse Candidate B;

f.    On or about December 26, 2011, KESARI gave Senator Sorenson a check in the amount of $25,000 drawn on the account of Company X, for which KESARI was the registered agent, in an effort to persuade Senator Sorenson to endorse Candidate B;

g.    On or about December 28, 2011, Senator Sorenson appeared at a campaign event held by Political Committee 2 and announced at that event that he was endorsing Candidate B for the Office of President of the United States;

h.    On or about December 28, 2011, BENTON, TATE, and KESARI began making arrangements for Senator Sorenson to be paid $25,000 by wire transfer from Political Committee 2 to pay Senator Sorenson without using the check that KESARI gave to Senator Sorenson, which Senator Sorenson held and never deposited;

i.    On or about December 29, 2011, in response to a public allegation from Candidate A that Senator Sorenson was offered money by Political Committee 2 to endorse Candidate B, BENTON, TATE, and KESARI caused Political Committee 2 to issue a statement from Senator Sorenson responding to Candidate A's allegations by denying that Political Committee 2 paid Senator Sorenson, and

stating, "Financial reports come out in just days which will prove what I'm saying is true";

j.     On or about December 29, 2011, BENTON emailed KESARI, TATE and a financial staffer of Political Committee 2 telling them to hold "for a couple days" the wire transfer that had been requested to pay Senator Sorenson;

k.     On or about December 29, 2011, TATE responded to BENTON'S email, affirming BENTON's decision to hold the wire transfer to Senator Sorenson;

l.     On or about December 29, 2011 KESARI responded to BENTON'S and TATE'S emails temporarily holding the wire transfer to Senator Sorenson, explaining, "We are holding till after the filing";

m.     On or about December 29, 2011, a financial staffer of Political Committee 2 noted in an email report of expenses "$25k – Dimitri's mystery wire," to which TATE responded "There will not be the 25k dimitri wire for now.   Wipe it off the books";

n.     On or about December 29, 2011, Senator Sorenson gave an interview with a national broadcast reporter in which Senator Sorenson denied that he had been paid by Political Committee 2 to endorse Candidate B, and stated that Political Committee 2's disclosure of its "expenditures" on its "financial reports" would show that Senator Sorenson was not paid by Political Committee 2;

o.     In or about January 2012 and in or about February 2012, BENTON, TATE, and KESARI made specific arrangements for Senator Sorenson to be paid by Political Committee 2;

8

p.      On or about January 24, 2012, Senator Sorenson prepared an invoice from
        Grassroots Strategy to Film Production Company W in the amount of $33,000;

q.      On or about February 5, 2012, KESARI caused Film Production Company W to
        send an invoice to Political Committee 2 in the amount of $38,125, to cover the
        payment of the invoice from Grassroots Strategy plus other expenses;

r.      On or about February 8, 2012, KESARI caused Political Committee 2 to pay Film
        Production Company W $38,125 by email to a financial staffer of Political
        Committee 2;

s.      On or about February 9, 2012, Senator Sorenson's company Grassroots Strategy
        received a payment from Film Production Company W in the amount of $33,000;

t.      On or about February 22, 2012, BENTON, TATE, and KESARI caused Political
        Committee 2 to list the February 8, 2012, expenditure of $38,125 on a campaign
        expense report under "Audio/Visual Expenses," rather than as a payment to
        Senator Sorenson;

u.      On or about April 20, 2012, BENTON, TATE, and KESARI caused Political
        Committee 2 to report the February 8, 2012, expenditure of $38,125 in a filing
        with the FEC as a payment to Film Production Company W for
        "AUDIO/VISUAL EXPENSES," omitting any reference to Senator Sorenson or
        Grassroots Strategy;

v.      On or about March 4, 2012, Senator Sorenson sent KESARI an invoice from
        Grassroots Strategy to Film Production Company W in the amount of $8,000;

9

w.      On or about March 21, 2012, KESARI caused Film Production Company W to send an invoice to Political Committee 2 in the amount of $8,850;

x.      On or about March 26, 2012, Senator Sorenson sent KESARI an invoice from Grassroots Strategy to Film Production Company W in the amount of $16,000;

y.      On or about March 26, 2012, KESARI caused Film Production Company W to send an invoice to Political Committee 2 in the amount of $8,850;

z.      On or about April 3, 2012, TATE approved the payment by Political Committee 2 of $16,000 to Senator Sorenson via the March 21, 2012, and March 26, 2012, invoices from Film Production Company W;

aa.     On or about April 3, 2012, KESARI caused Political Committee 2 to pay Film Production Company W $17,700 by email to a financial staffer of Political Committee 2;

bb.     On or about July 18, 2012, BENTON, TATE, and KESARI caused Political Committee 2 to report the April 3, 2012, expenditure of $17,700 in a filing with the FEC as a payment to Film Production Company W for "AUDIO/VISUAL EXPENSES," omitting any reference to Senator Sorenson or Grassroots Strategy;

cc.     On or about April 9, 2012, Senator Sorenson's company Grassroots Strategy received a payment from Film Production Company W in the amount of $16,000;

dd.     On or about May 2, 2012, Senator Sorenson sent KESARI and Film Production Company W an invoice from Grassroots Strategy to Film Production Company W for $8,000;

ee.    On or about May 2, 2012, KESARI caused Film Production Company W to send an invoice to Political Committee 2 in the amount of $8,850;

ff.    On or about May 2, 2012, KESARI forwarded the invoice from Film Production Company W to BENTON with a note reading, "Kent's bill.   Pay?"

gg.    On or about May 2, 2012, BENTON approved the payment by Political Committee 2 of the May 2, 2012 invoice from Film Production Company W;

hh.    On or about May 2, 2012, KESARI caused Political Committee 2 to pay Film Production Company W $8,850 by email to a financial staffer of Political Committee 2;

ii.    On or about July 18, 2012, BENTON, TATE, and KESARI caused Political Committee 2 to report the May 2, 2012, expenditure of $8,850 in a filing with the FEC as a payment to Film Production Company W for "AUDIO/VISUAL EXPENSES," omitting any reference to Senator Sorenson or Grassroots Strategy;

jj.    On or about May 4, 2012, Senator Sorenson's company Grassroots Strategy received a payment from Film Production Company W in the amount of $8,000;

kk.    On or about May 21, 2012, Senator Sorenson sent invoices from Grassroots Strategy to Film Production Company W totaling $16,000;

ll.    On or about May 24, 2012, KESARI caused Film Production Company W to send an invoice to Political Committee 2 in the amount of $8,850;

mm.    On or about May 29, 2012, TATE approved the payment by Political Committee 2 of Senator Sorenson via Film Production Company W's invoice in the amount of $8,850;

nn.     On or about May 29, 2012, KESARI caused Political Committee 2 to pay Film
        Production Company W $8,850 by email to a financial staffer of Political
        Committee 2;

oo.     On or about July 18, 2012, BENTON, TATE, and KESARI caused Political
        Committee 2 to report the expenditure on May 29, 2012, of $8,850 in a filing with
        the FEC as a payment to Film Production Company W for "AUDIO/VISUAL
        EXPENSES," omitting any reference to Senator Sorenson or Grassroots Strategy;

pp.     On or about June 12, 2012, Senator Sorenson's company Grassroots Strategy
        received a payment from Film Production Company W in the amount of $8,000;

qq.     On or about June 18, 2012, KESARI caused Film Production Company W to send
        an invoice to Political Committee 2 in the amount of $8,850;

rr.     On or about June 25, 2012, TATE emailed KESARI regarding Film Production
        Company W's invoice, "What is this?   What is it for, who is it?   Why do we
        keep paying them?   The last payment was supposedly the last";

ss.     On or about June 25, 2012, KESARI responded to TATE's email, "This the last
        payment for kent Sorenson [sic].   The deal jesse agreed to with kent";

tt.     On or about June 25, 2012, KESARI sent a second response to TATE's email, "Is
        [sic] was for 6 months";

uu.     On or about June 25, 2012, TATE approved the payment of Senator Sorenson via
        Film Production Company W's invoice;

vv.    Between on or about June 25, 2012, and on or about June 27, 2012, KESARI caused Political Committee 2 to pay Film Production Company W $8,850 by email to a financial staffer of Political Committee 2;

ww.    On or about September 5, 2012, BENTON, TATE, and KESARI caused Political Committee 2 to report the June 27, 2012, expenditure of $8,850 in a filing with the FEC as a payment to Film Production Company W for "AUDIO/VISUAL EXPENSES," omitting any reference to Senator Sorenson or Grassroots Strategy;

xx.    On or about July 27, 2012, Senator Sorenson's company Grassroots Strategy received a payment from Film Production Company W in the amount of $8,000;

yy.    In or about September 2013, shortly after media reports referencing ongoing investigations by the FBI and FEC of the payments to Sorenson by Political Committee B, KESARI flew to Omaha, Nebraska, backtracked to Senator Sorenson's home in Iowa, required that he and Senator Sorenson show each other that neither was wearing a recording device, and then asked that Senator Sorenson either return to KESARI or alter the $25,000 check that KESARI previously gave to Senator Sorenson on or about December 26, 2012, which Senator Sorenson refused to do;

zz.    On or about September 19, 2013, at a deposition taken in connection with an investigation by the Iowa State Senate into the circumstances surrounding Senator Sorenson's endorsement of Candidate B and payment by Political Committee 2, Senator Sorenson falsely testified under oath that he had never been paid by Political Committee 1 or by Political Committee 2;

13

aaa.     On or about July 21, 2014, and on or about July 22, 2014, in a proffer session with the FBI, BENTON falsely stated that there were no payments from Political Committee 2 to Senator Sorenson, either directly or through another entity;

bbb.     On or about July 21, 2014, and on or about July 22, 2014, in a proffer session with the FBI, BENTON falsely stated that he was not aware of any payments from Political Committee 2 to Senator Sorenson either directly or through another entity;

ccc.     On or about July 21, 2014, in a proffer session with the FBI, in response to questioning about whether Political Committee 2 paid Senator Sorenson through a third party, BENTON falsely denied that Senator Sorenson was paid by Political Committee 2 either directly or through a third party, saying, "I am not splitting hairs: Sorenson was not getting paid";

ddd.     On or about July 22, 2014, in a proffer session with the FBI, BENTON falsely stated that there was no way Senator Sorenson would be paid after BENTON had told the press that Senator Sorenson was not being paid by Political Committee 2;

eee.     On or about July 22, 2014, in a proffer session with the FBI, BENTON falsely stated that Senator Sorenson had not been paid by Political Committee 2 because once BENTON said that Senator Sorenson had not been paid by Political Committee 2, BENTON "could not just lie to the press" and arrange for Senator Sorenson to be paid by Political Committee 2 as the payment "would be on an FEC report";

14

fff. On or about August 19, 2014, in a proffer session with the FBI, TATE falsely stated that there were no payments from Political Committee 2 to Senator Sorenson, either directly or through another entity;

ggg. On or about August 19, 2014, in a proffer session with the FBI, TATE falsely stated that he was not aware of any payments from Political Committee 2 to Senator Sorenson, either directly or through another entity.

This is a violation of Title 18 United States Code, Section 371.

**COUNT TWO**
(Causing False Records)

17.     Paragraphs 1 through 11 of this Indictment are re-alleged as if fully set forth herein.

18.     From in or about February 2012 to in or about August 2012, in the Southern District of Iowa and elsewhere, the defendants,

JESSE R. BENTON,
JOHN M. TATE, and
DIMITRIOS N. KESARI,

aided and abetted by each other and by Iowa State Senator Kent Leroy Sorenson, with the intent to impede, obstruct, and influence, and in relation to and contemplation of, the investigation and proper administration of matters within the jurisdiction of departments and agencies of the United States, knowingly concealed, covered up, falsified, and made a false entry in a record, document and tangible object, to wit, causing Political Committee 2 to falsely record payments to Film Production Company W as audio/visual expenses that were in fact disbursements to Iowa State Senator Kent Leroy Sorenson, and which falsification the defendants well knew and contemplated were related to the proper administration of Political Committee 2's required disclosures under the Election Act by the FEC.

This is a violation of Title 18 United States Code, Sections 2 and 1519.

16

## COUNT THREE
(Causing False Campaign Contribution Reports)

19.     Paragraphs 1 through 11 of this Indictment are re-alleged as if fully set forth herein.

20.     From in or about February 2012 to in or about August 2012, in the Southern District of Iowa and elsewhere, the defendants,

JESSE R. BENTON,
FREDERICK
JOHN M. TATE, and
DIMITRIOS N. KESARI,

aided and abetted by each other and by Iowa State Senator Kent Leory Sorenson, willfully caused the authorized campaign committee of a candidate for the Office of President of the United States to falsely report to the FEC the disbursements to persons to whom that committee made expenditures over $200, to wit causing Political Committee 2 to report to the FEC disbursements to Film Production Company W as audio/visual expenses that were in fact disbursements to Iowa State Senator Kent Leroy Sorenson aggregating $25,000 and more in calendar year 2012.

This is a violation of Title 52, United States Code, Sections 30104(a)(1), 30104(b)(5)(A), & 30109(d)(1)(A)(i), and Title 18 United States Code, Section 2.

17

## COUNT FOUR
### (False Statements Scheme)

21.     Paragraphs 1 through 11 of this Indictment are re-alleged as if fully set forth herein.

22.     From in or about February 2012 to in or about August 2012, in the Southern District of Iowa and elsewhere, the defendants,

JESSE R. BENTON,
JOHN M. TATE, and
DIMITRIOS N. KESARI,

aided and abetted by each other and by Iowa State Senator Kent Leroy Sorenson, knowingly and willfully falsified, concealed, and covered up by a trick, scheme, and device a material fact in a matter within the jurisdiction of the executive branch of the government of the United States, to wit using false invoices to cause Political Committee 2 to report to the FEC disbursements to Film Production Company W as audio/visual expenses that were in fact disbursements to Iowa State Senator Kent Leroy Sorenson.

This is a violation of Title 18 United States Code, Sections 2 & 1001(a)(1).

## COUNT FIVE
(False Statements to Law Enforcement)

23.     Paragraphs 1 through 11 of this Indictment are re-alleged as if fully set forth herein.

24.     On or about July 21, 2014 and July 22, 2014, in the Southern District of Iowa, the defendant,

JESSE R. BENTON,

knowingly and willfully made a materially false, fictitious, and fraudulent statement or representation in a matter within the jurisdiction of the executive branch of the government of the United States, to wit, falsely telling Special Agents of the FBI that Iowa State Senator Kent Leroy Sorenson was not paid by Political Committee 2 either directly or through another entity and that BENTON was not aware of any payments to Iowa State Senator Kent Leroy Sorenson from Political Committee 2 either directly or through another entity.

This is a violation of Title 18 United States Code, Sections 2 & 1001(a)(2).

19

## COUNT SIX
(Obstruction of Justice – Law Enforcement Officers and Courts)

25.     Paragraphs 1 through 11 of this Indictment are re-alleged as if fully set forth herein.

26.     In or about August 2014, in the Southern District of Iowa, the defendant,

DIMITRIOS N. KESARI,

corruptly persuaded another person, and attempted to corruptly persuade another person, with the intent to hinder, delay and prevent the communication to law enforcement officers and judges of the United States information related to the commission and possible commission of a federal offense, to wit, he corruptly persuaded and attempted to corruptly persuade Iowa State Senator Kent Leroy Sorenson to withhold from discovery by federal law enforcement officers and courts information related to payments by Political Committee 2.

This is a violation of Title 18 United States Code, Section 1512(b)(3).

A TRUE BILL

FOREPERSON

RAYMOND N. HULSER
Chief
Public Integrity Section, Criminal Division
United States Department of Justice

By:

Richard C. Pilger
Director, Election Crimes Branch
Jonathan I. Kravis
Trial Attorney
Public Integrity Section, Criminal Division
United States Department of Justice

20